UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

UNITED STATES OF AMERICA,

    Plaintiff,

v.

THERESA MARIE FINFROCK,

    Defendant.

_____/

Case No. 2:08-cr-54
HON. R. ALLAN EDGAR

## REPORT AND RECOMMENDATION

Defendant Theresa Marie Finfrock is charged with voluntary manslaughter, in violation of 18 U.S.C. §§ 1112, 1153 and 1151; assault with intent to murder, in violation of 18 U.S.C. §§ 113(a)(6), 113(b)(2), 1365(h)(3), 1153 and 1151, and giving false statements, in violation of 18 U.S.C. § 1001(a)(2). The charges stem from the death of defendant's seven-year-old son. Defendant moves to suppress statements made to police and FBI agents on July 7, 2005, and March 6, 2008. A hearing was held on October 8, 2009, at which testimony was taken from FBI Special Agent Paul Cowley, former FBI Special Agent James Hoppe, and Sault Ste. Marie Tribal Victim Advocate Patricia Allard. The 2005 interview occurred at the Michigan State Police Post in Sault Ste. Marie, Michigan. The 2008 interview occurred in Kincheloe, Michigan.

The parties have stipulated to the statements that defendant seeks to suppress, which include statements made on July 7, 2005, that:

    1. She had shoved her son, Daniel Jose Finfrock, at any time;

    2. She had pushed him at some time prior to January 6, 2005;

3. She had pushed him on January 6, 2005;

4. She was frustrated and expressed it physically towards him at any time:

5. She shook him at any time; and

6. She had previously lied to investigators.

*See* Docket Entry #34. Further, the parties have stipulated that defendant wishes to suppress the following statements made on March 6, 2008:

1. "It was the night before that I pushed him." Or she had pushed her son, Daniel Jose Finfrock, at any time (or any description as to how she might have pushed him);

2. She had previously lied to investigators;

3. "I did push him hard, I remember his head hitting the mesh part. If that caused it, then that caused it." Or she had otherwise pushed him on January 6, 2005;

4. "I remember he went back and he went down" (or any description as to how hard she might have pushed him or how he might have reacted to any such push);

5. "I was mad at myself, and I took it out on him," she expressed her frustration by physically harming him, or she may have contributed to or otherwise caused his death;

6. She regretted her behavior towards him at any time; and

7. She was haunted for being responsible for causing his death.

*Id*. In addition to the allegedly coercive nature of the 2008 interview, defendant argues that the statement she made in 2008 should be suppressed as the "fruit of the poisonous tree," as a result of the illegal interview that occurred during a polygraph examination in 2005.

The victim died from head trauma on January 8, 2005. Defendant was first interviewed on January 7, 2005, at the Tribal Health Center, after the victim sustained his injuries. The interview was conducted by Special Agent Paul Cowley and Sault Ste. Marie Tribal Police

Officer Sam Gardner. A second interview was conducted approximately three hours later. During the interviews, defendant indicated that she had not left her residence during the evening hours of January 6, 2005. Defendant subsequently admitted that she had lied during the first interviews, and that she had left her residence for a short time on January 6, 2005. A fourth interview was conducted on April 16, 2005, when defendant implicated her boyfriend in her son's death. This interview was initiated after Special Agent Cowley was informed by Tribal Social Services or Tribal Police that defendant wished to speak with the FBI. A recorded telephone call was set up between defendant and her boyfriend. Defendant's boyfriend denied involvement.

Defendant submitted to a polygraph examination on July 7, 2005. Defendant was accompanied to the examination by her mother, step father, and a victim advocate from the Sault Ste. Marie Tribe of Chippewa Indians. Defendant was advised of her Miranda rights and signed a waiver of those rights. Defendant was advised in writing that the polygraph examination was being administered in connection with the death of her son. She was further advised that she could refuse to take the polygraph, stop the test at any time, or refuse to answer questions. Defendant signed the consent form. Defendant indicated that she wanted to take the polygraph despite being advised by her attorney not to take the test.

Defendant arrived at the post at 12:12 p.m. and finished the polygraph examination shortly before 6:00 p.m. The interview began with a pretest, during which biographical information and the death of defendant's son was discussed. The pre-interview took about two hours. The first polygraph test took place at about 2:30 p.m. with an "acquaintance test" to make sure that the equipment worked properly. The first set of questions was asked from 2:37 p.m. to 3:01 p.m. Special Agent Hoppe left the room to score the first chart. Defendant was left by herself in the room. When Special Agent Hoppe returned, he spoke with defendant for approximately 30 minutes and

formulated a second set of questions. He typed those questions into his laptop computer and asked the second series of questions starting at about 3:50 p.m. and ending just after 4:00 p.m. Special Agent Hoppe then left the room to score the chart. At about 4:30 p.m., he went back into the room to re-interview defendant. Defendant did not leave the interview room during breaks because she was attached to the machine with a blood pressure monitor. Special Agent Hoppe testified that he did not take the machine off defendant until defendant requested to be taken off the equipment. After the second group of tests, Special Agent Hoppe informed defendant that he believed that she was not being truthful. At this point, Special Agent Hoppe stated that voices were slightly raised. Defendant then left the interview room. During the interview process, water and break requests were honored and defendant was provided with a candy bar. Defendant confessed to shoving the victim hard while he was in bed just prior to taking him to the hospital.

On March 6, 2008, the FBI conducted its last interview with defendant. Special Agent Crowley and Special Agent Jay Johnston approached the defendant at work. Defendant consented to the interview. The defendant entered the Special Agents' vehicle and they drove a couple of blocks to an empty parking lot to conduct the interview. Plaintiff indicated that she knew the agents wanted to speak to her and that she was glad to talk to them. Special Agent Cowley testified that there was no yelling or screaming and defendant never asked to stop the interview.

Victim Advocate Patricia Allard testified that she was present at the police post throughout the polygraph examination of defendant in July of 2005. She was seated in the lobby area and never heard any yelling or screaming. When defendant came out of the interview room, defendant did not complain of any deprivations of food or water. Defendant's mother was in the lobby area the entire time and her step father was there some of the time, but had left the building at some point.

Defendant argues that the interviews were coercive because of the length of time and because the FBI agents yelled at her during the interview. The government argues that the interviews were with consent, Miranda warnings were given, and defendant waived her rights. The government asserts that nothing about the interviews was coercive. No one yelled at defendant and defendant was free to leave, was provided food, drink and breaks when needed, and could terminate the interviews at any time.

In *United States v. Salvo*, the Sixth Circuit explained:

> The Fifth Amendment provides that a defendant cannot be "compelled in any criminal case to be a witness against himself." Consistent with this right against self incrimination, the Supreme Court's decision in *Miranda v. Arizona*, 384 U.S. 436, 478-479, 86 S.Ct. 1602, 1630, 16 L.Ed.2d 694 (1966), ruled that suspects cannot be subjected to a custodial interrogation until they have been advised of their rights. In order to encourage compliance with this rule, incriminating statements elicited from suspects in custody cannot be admitted at trial unless the suspect was first advised of his or her Miranda rights. *Id*.

133 F.3d 943, 948 (6th Cir. 1998).

It is well established that law enforcement's obligation to administer Miranda warnings is triggered where there has been such a restriction on a person's freedom of movement as to render him "in custody." *Miranda*, 384 U.S. at 444. In determining whether an individual is in custody, the Court must examine the totality of the circumstances surrounding the interrogation. Courts look to factors which include: (1) the purpose of the questioning; (2) whether the place of the questioning was hostile or coercive; (3) the length of the questioning; and (4) other indicia of custody such as whether the suspect was informed at the time that the questioning was voluntary or that the suspect was free to leave; whether the suspect possessed unrestrained freedom of movement during

questioning; and whether the suspect initiated contact with the police or voluntarily acquiesced to the request for an interview. *See Salvo*, 133 F.3d at 950.

In *California v. Beheler*, 463 U.S. 1121, 103 S. Ct. 3517 (1983), the suspect voluntarily accompanied police to the station for questioning and freely departed at the end of the interview, after being told he was not under arrest but that his statement would be evaluated by the district attorney concerning that possibility. Similarly, in *Oregon v. Mathiason*, 429 U.S. 492, 97 S. Ct. 711 (1977), the defendant agreed to meet the investigating officer at the station house for an interview. The defendant was told that he was a burglary suspect but was not under arrest. He was told that his truthfulness would be evaluated by the district attorney or judge. He was taken into a closed office where he was questioned concerning the burglary. The defendant was falsely told that his fingerprints were found at the scene. After a long pause, the defendant admitted to the crime. The defendant was then given Miranda warnings, but was not arrested. He left the station after being informed that the case would be referred to the district attorney for a decision whether charges would be pursued.

In both cases, the Supreme Court found that Miranda warnings were unnecessary because questioning did not take place in a context in which the defendant's freedom to depart was restricted in a meaningful way. The Court acknowledged that all police interviews of those suspected of a crime have coercive aspects. However, police are not required to administer Miranda warnings to every suspect they interview. It is only under the additional pressure of a custodial environment that *Miranda* is triggered.

> "In determining whether a confession has been elicited by means that are unconstitutional, this court looks to the totality of the circumstances concerning whether a defendant's will was overborne in a particular case." *United States v. Mahan,* 190 F.3d 416, 422 (6th Cir.1999) (quoting *Ledbetter v. Edwards,* 35 F.3d 1062, 1067 (6th

Cir.1994)) (internal quotation marks omitted). In determining the voluntariness of a confession, a reviewing court will not disturb the trial court's findings concerning specific events surrounding the confession unless clear error appears on the record. *United States v. Wrice,* 954 F.2d 406, 410-11 (6th Cir.1992). When a defendant claims that a confession was coerced, the government bears the burden of proving by a preponderance of the evidence that the confession was in fact voluntary. This Court has established three requirements for a finding that a confession was involuntary due to police coercion: (I) the police activity was objectively coercive; (ii) the coercion in question was sufficient to overbear the defendant's will; and (iii) the alleged police misconduct was the crucial motivating factor in the defendant's decision to offer the statement. *Mahan,* 190 F.3d at 422 (internal citations omitted).

*United States v. Johnson*, 351 F.3d 254 (6th Cir. 2003). As the Sixth Circuit has explained:

"Threshold to the determination that a confession was 'involuntary' for due process purposes is the requirement that the police 'extorted [the confession] from the accused by means of coercive activity.'" *United States v. Rohrbach*, 813 F.2d 142, 144 (8th Cir. 1987) (citing *Colorado v. Connelly*, 479 U.S. 157, 107 S.Ct. 515, 52, 93 L.Ed.2d 473 (1986)). Once it is established that the police activity was objectively coercive, it is necessary to examine petitioner's subjective state of mind to determine whether the "coercion" in question was sufficient to overbear the will of the accused. *Rohrbach*. 813 F.2d at 144. Finally, petitioner must prove that his will was overborne *because* of the coercive police activity in question. If the police misconduct at issue was not the "crucial motivating factor" behind petitioner's decision to confess, the confession may not be suppressed.

*McCall v. Dutton*, 863 F.2d 454, 459 (6th Cir. 1988).

Defendant is not claiming a failure to receive Miranda warnings. Defendant is claiming that the interviews were conducted in a coercive manner and, more specifically, that the Special Agents yelled and screamed at her causing her to make involuntary statements. There exists no evidence in the record that the interviews were conducted in a coercive manner. In fact, the testimony and evidence presented establishes that the interviews were conducted in a professional and non-coercive manner. Defendant was given Miranda warnings and told that she did not have

to speak with the agents. There is no evidence that any of the Special Agents yelled or screamed at defendant. Special Agent Hoppe testified that voices were slightly raised for a brief period after the polygraph examinations when Special Agent Hoppe confronted defendant and told her that he thought she was not being truthful. Defendant ended the interview after that point and left the building. There is no indication that defendant was exposed to coercive interview techniques, or that defendant made statements against her will to the Special Agents due to coercive questioning tactics.

Accordingly, it is recommended that defendant's motion to suppress statements (Docket #21) and supplemental motion to suppress statements (Docket #26) be denied.

NOTICE TO PARTIES: Objections to this Report and Recommendation must be served on opposing parties and filed with the Clerk of the Court within ten (10) days of receipt of this Report and Recommendation. 28 U.S.C. § 636(b)(1)(C); Fed. R. Civ. P. 72(b); W.D. Mich. LCivR 72.3(b). Failure to file timely objections constitutes a waiver of any further right to appeal. *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). *See also Thomas v. Arn*, 474 U.S. 140 (1985).

/s/ Timothy P. Greeley
TIMOTHY P. GREELEY
UNITED STATES MAGISTRATE JUDGE

Dated: October 30, 2009